**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————  :
                                   :
VINCENT J. CONTE,                  :
                                   :
            Plaintiff,             :        Civil Action No. 19-08333 (GC) (TJB)
                                   :
      v.                           :
                                   :
ZACHARY GOODWIN, et al.,           :        **OPINION**
                                   :
            Defendants.            :
———————————————————  :

**CASTNER, United States District Judge**

      Plaintiff Vincent J. Conte is a state prisoner currently incarcerated at New Jersey State Prison (NJSP) in Trenton, New Jersey.  Presently pending before this Court is a motion for summary judgment brought by Defendants New Jersey Department of Corrections (NJDOC), NJSP, Senior Corrections Officer Zachary Goodwin (SCO Goodwin), and Senior Corrections Officer Marek Napierala (SCO Napierala), seeking dismissal of Plaintiff's Amended Complaint, which asserts claims pursuant to 42 U.S.C. § 1983, the New Jersey Civil Rights Act (NJCRA), and state law.  (*See* ECF No. 83.)  The Court carefully considered the parties' submissions and decides the motion without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### a.  Summary Judgment Record

Plaintiff, born on February 8, 1952 (*see* Deposition of Vincent J. Conte ("Pl. Dep.") 5:1-2 (Ex. A)), is a state inmate at NJSP in Trenton, New Jersey, where he has been incarcerated for over twenty years.  (CSUMF ¶ 1 (citing Pl. Dep. at 6:23–7:1).[1])  During his incarceration, Plaintiff has not faced disciplinary action or been written up for behavioral issues.  (*Id.* at 24:2-3.)

SCO Goodwin and SCO Napierala are corrections officers and were working at NJSP on Tier 2 Left (2L) on December 2, 2018.  (DSUMF ¶ 11 (citing Pl. Dep. 10:18-25); RSUMF ¶ 11.)  It is undisputed that SCO Goodwin and SCO Napierala received CPR and first aid training but had no additional medical training.  (DSUMF ¶ 10 (citing Goodwin Sec. Dep. 43:5-16 (Ex. G); Napierala Sec. Dep. 42:9-18 (Ex. H)); RSUMF ¶ 10.)

SCO Goodwin and SCO Napierala were assigned to conduct random urine drug screenings on December 2, 2018, in Tier 2L of NJSP, in accordance with NJSP policy.  (DSUMF ¶¶ 13-14 (citing Goodwin Sec. Dep. 17:23-25; Napierala Sec. Dep. 21:21-24); RSUMF ¶¶ 13-14.)  Plaintiff was housed on 2L on December 2, 2018, and was randomly selected to provide a urine sample on that date.  (DSUMF ¶ 12 (SID Report (Ex. F)); RSUMF ¶ 12; CSUMF ¶ 6 (citing Goodwin's First Dep. 17:18-18:7 (Ex. B); Napierala First Dep. 22:13-16 (Ex. C)).)  At the time, Plaintiff's medical history was "[s]ignificant for hypertension, hyperlipidemia, prediabetes, [and] benign prostatic hypertrophy."  (CSUMF ¶ 2 (citing Dec. 2, 2018 Intake Form, CONTE 0110 (Ex. I)).  Due to having benign prostatic hypertrophy, Plaintiff has "difficulty [with] urination and emptying of [the] bladder." (CSUMF ¶ 3 (citing CONTE 0635 (Ex. J)).)  Due to a mix up by medical staff,

---

[1]     "DSUMF" refers to Defendants' statement of material facts at ECF No. 83-3, "RSUMF" refers to Plaintiff's responsive statement at ECF No. 85-1, and "CSUMF" refers to Plaintiff's counterstatement of material facts at ECF No. 85-2.

Plaintiff was not taking medication to treat his prostate condition on December 2, 2018.  (CSUMF ¶ 4 (citing Pl. Dep. 9:19-24).)  It is undisputed, however, that Plaintiff had never had a heart attack prior to December 2, 2018.  (DSUMF ¶ 8 (citing Pl. Dep. at 12:22-23); RSUMF ¶ 8.)

Plaintiff contends that SCO Goodwin and SCO Napierala both supervised the urine drug screening that Plaintiff underwent on December 2, 2018.  (RSUMF ¶ 16 (citing Goodwin First Dep. 17:18-18:7; Napierala First Dep. 21:21-24, 23:2-9).)  SCO Goodwin administered the test from the officer's desk located directly outside of the cell where the test took place, and SCO Napierala supervised the prisoners from the hallway outside the cell.  (CSUMF ¶ 6 (citing Goodwin First Dep. 30:4-8; Napierala First Dep. 28:12-18).)

Pursuant to NJSP's Inmate Urine Drug Testing Policy, prisoners are permitted two hours to provide a urine sample.  (RSUMF ¶ 22 (citing Ex. D).)  During the urine testing period, Plaintiff told Defendants that he had an enlarged prostate that made urination difficult, but Defendants did not offer him any accommodations.  (CSUMF ¶ 7 (citing Napierala First Dep. 40:11-16; Goodwin Sec. Dep. 63:16-20).)

It is undisputed that Plaintiff experienced a heart attack during the two-hour testing period, and the record includes a video from a camera positioned one or more stories above the testing area.  (DSUMF ¶ 17 (citing Dec. 2, 2018 2L Security Video Footage (Ex. C.)); RSUMF ¶ 17.)  Plaintiff, who appears overweight, arrives to the testing area with SCO Napierala, signs paperwork, enters and exits the testing cell, and stands next to the cell door in front of the officer's desk.  (DSUMF ¶¶ 19-21 (citing Dec. 2, 2018 2L Security Video Footage).)  The video footage then shows Plaintiff rubbing the top of his stomach and bending over two times.  (*See* CSUMF ¶ 14 (citing Dec. 2, 2018 2L Video Footage at timestamps 8:55, 8:56, 8:59; Napierala First Dep. 38:12-18 (Ex. C)).)  Although Plaintiff is facing the camera, the video is not high quality, and it is difficult

to discern Plaintiff's facial expressions, and whether he is talking, sweating, or breathing heavily. (*See id.*)

Plaintiff testified that at approximately 9:05 a.m., he "started having massive chest pains and a numbness through the upper body and [he] realized [he] was having a heart attack." (*See* CSUMF ¶ 10 (citing Pl. Dep. 11:16-24).) Plaintiff "was standing almost directly in front of the desk at the time . . . and Goodwin was sitting in his seat . . . when [Plaintiff] told him I'm having chest pains. [Plaintiff] said I'm having a heart attack, I need help." (*Id.* at 19-24.) Plaintiff testified that he knew he was having a heart attack because he experienced numbness though his upper body, sweating, and massive chest pains. (Pl. Dep. 12:5-9; 12:24-13:4.) Plaintiff also testified that he was in front of a clock in front of the officer's desk that read 9:05 a.m. when he told SCO Goodwin he was having a heart attack. (CSUMF ¶ 17 (citing Pl. Dep. 12:10-13:7).) Plaintiff further testified that

> [SCO] Goodwin looked at me and for some reason he turned around and grabbed a medical pass behind his desk and he said you'll get the pass when we get a urine sample. And that was it. He made it quite clear I was going nowhere until he got the urine sample.

(Pl. Dep. 12:16-21; *see also id.* at 13:6-11 (explaining that Goodwin "did nothing," "grabbed the pass, showed [Plaintiff] the pass, he pointed to it and he said you'll get the pass when we get a urine sample").)

Plaintiff testified that SCO Napierala heard Plaintiff tell SCO Goodwin he was having a heart attack. (Pl. Dep. at 13:19-24.) Napierala told Plaintiff, "you signed the paperwork for the drug test" and also said "until we get a urine sample, you're not going anywhere." (*Id.* at 13:12-18.) Plaintiff testified that "he told [Defendants] a couple of times" that he "was having a heart attack." (CSUMF ¶ 11 (citing Pl. Dep. 15:17-18).)

Although he stands up and walks around occasionally, Plaintiff is seated in the "barber chair" for most of the time between 9:05 a.m. and 10:10 a.m.  (*See Generally*, Dec. 2, 2018 2L Security Video Footage; SID Report.)  SCO Napierala is seated next to him and SCO Goodwin is next to SCO Napierala at the officer's desk.  (*Id.*)  Plaintiff testified that he grabbed his chest, bent over several times, tried to compose himself, and was having trouble breathing.  (Pl. Dep. at 14:4-14.)  Plaintiff further testified that he struggled to provide the urine sample, and the pain was so intense that he lost control of his bowels and defecated before he could reach the restroom.  (CSUMF ¶ 18 (citing Pl. Dep at 14:15-25).)

According to Special Investigations Division Report dated December 24, 2018, "SCPO Goodwin and SCPO Napierala denied being advised by inmate Conte that he was having 'some sort of attack' and upon his (Inmate Conte) request was provided with a pass."  (SID Report at 4.)  In his deposition, SCO Goodwin testified that Plaintiff complained of stomach pain during the test period and complained of chest or stomach pain after he provided a sample.  (CSUMF ¶ 15 (citing Goodwin First Dep. 41:11-16; 59:13-16 (Ex. B)).)  The video shows SCO Goodwin writing on the small pad of paper at 10:16 a.m., after Plaintiff provided the urine sample.  (Dec. 2, 2018 2L Security Video at timestamp 10:16.)  The medical pass SCO Goodwin issued to Plaintiff listed "CHEST PAIN" and did not mention stomach pain.  (CSUMF ¶ 16 (citing Medical Pass (Ex F)).)

The NJSP Internal Management Procedure titled "Emergency Response–Code 53" (IMP), which applies to all "Custody Staff," lists "[c]ardiac or respiratory problems, that appear to be accompanied by difficulty breathing, severe pain, and/or loss of consciousness" as criteria for activating a medical emergency, known as a "Code 53."[2]  (CSUMF ¶ 21 (citing IMP (Ex G).)  It

---

[2]      There are two versions of the IMP in the record, but they are identical in this respect.

is undisputed that neither Defendant called a Code 53 after Plaintiff told SCO Goodwin that he had chest pain and was having a heart attack.  (CSUMF ¶ 22 (citing Pl. Dep. 12:5-9, 13:6-18).)

SCO Napierala testified that if Plaintiff had told him he was having chest pains, SCO Napierala would have treated it as a medical emergency and called a Code 53 for emergency care. (CSUMF ¶ 19 (citing Napierala Sec. Dep. 43:11-16 (Ex. E)).)  SCO Goodwin testified that "if someone was slumped over in pain complaining of chest pains and they couldn't walk, that's an emergency.  So at that point[,] I would call a Code 53."  (CSUMF ¶ 20 (citing Goodwin Sec. Dep. 76:16-19 (Ex. D)).)

At 10:27 a.m., after Plaintiff provided the urine sample, and approximately 90 minutes after Plaintiff allegedly began experiencing heart attack symptoms, SCO Goodwin issued Plaintiff a medical pass, which listed "CHEST PAIN" as the only symptom.  (CSUMF ¶ 23 (citing Medical Pass).)  The medical pass lists three options: "medical care," "emergency care," and "life-threatening care" with corresponding check boxes, and "medical care" is checked.  (*See* Medical Pass.)  It is undisputed that neither Defendant asked Plaintiff if he needed help getting to the medical clinic.  (CSUMF ¶ 24 (citing Napierala First Dep. 41:7-11).)  Because Plaintiff was required by NJSP policy to wear a khaki shirt before leaving the unit, Plaintiff also had to walk back to his cell to change his shirt prior to heading to the medical clinic.  (CSUMF ¶ 25 (citing Dec. 2, 2018 2L Security Video Footage at timestamp 10:17).)  According to Plaintiff, SCO Goodwin "knew I was in pain . . . .  [H]e said to me do you think you're going to make it down to medical" and made this comment in a "joking and sarcastic way."  (CSUMF ¶ 26 (citing Pl. Dep. 20:11-16).)

When Plaintiff arrived at the medical clinic, Major Craig Sears viewed his medical pass and asked: "[W]hy wasn't [C]ode 53 called and who allowed this old man to walk down here with

chest pains." (CSUMF ¶ 28 (citing Pl. Dep. 19:4-6).)  Plaintiff underwent evaluation and Susan Springler, RNC, gave him an electrocardiogram, recording that Plaintiff exhibited "ST Elevation" and "acute MI."  (CSUMF ¶ 29 (citing Am. Compl. ¶ 26 (Ex. K)).)  Springler gave orders to call 911, gave Plaintiff three nitroglycerin tablets (CSUMF ¶ 30 (citing Am. Compl. ¶ 38)), and stated "we have a heart attack patient to be sent over to St. Francis."  (*Id.* (citing Pl. Dep. 19:13-14).)  Plaintiff was transported by ambulance to St. Francis Medical Center for emergency treatment for his heart attack.  (CSUMF ¶ 31 (citing Am. Compl. ¶ 39).)

The Medical Intake Form completed by Samir Patel, M.D., at St. Francis, indicates that Plaintiff arrived at St. Francis "within one hour after the patient had reported severe substernal chest pain with radiation of the pain to both of his arms.  The patient also stated that he had significant amount of shortness of breath and also was diaphoretic."[3]  Doctors treated Plaintiff for a major blockage, called an ST Elevation Myocardial Infarction (STEMI), and Plaintiff received a stent to restore blood flow.  (CSUMF ¶ 32 (citing Pl. Dep. 25:7-11); *see also* St. Francis Medical Intake Form (Ex. I) ("The patient had successful placement of a drug-eluting stent to the left anterior descending artery.").)  Plaintiff remained at St. Francis for four to five days until he was able to return to the infirmary and finally to his unit.  (CSUMF ¶ 35 (citing Pl. Dep. 26:3-5).)

Plaintiff testified that he takes several medications for cholesterol, high blood pressure, and stool softening (because bowel strain stresses the heart).  (CSUMF ¶ 37 (citing Pl. Dep. 32:21-25).)  Plaintiff also testified that he is trying to lose weight to reduce stress on his heart.  (CSUMF ¶ 38 (citing Pl. Dep. 33:10-13).)

---

[3]      According to the Cleveland Clinic, "Diaphoresis means excessive sweating due to a secondary condition."  *See* https://my.clevelandclinic.org/health/diseases/24496-diaphoresis (last visited Aug. 14, 2024.)

In the Amended Complaint, Plaintiff alleges that he has felt humiliated, degraded, victimized, embarrassed, and emotionally distressed by the incident on December 2, 2018. (RSUMF ¶ 39 (citing Am. Compl. ¶ 47).)  Defendants contend that Plaintiff does not have a psychiatric diagnosis to support his claims that he suffered emotional distress resulting from this incident.  (DSUMF ¶ 39 (citing Pl. Dep. 10:12-13).)  In response, Plaintiff notes that he "has not yet had the opportunity to undertake expert discovery in this matter" and "reserves the right to supplement the record with an expert report on the nature and extent of the emotional distress he suffered."  (RSUMF ¶ 39.)

### b.  Procedural History

Plaintiff filed this action on or about March 11, 2019 (ECF No. 1); the Court permitted his Complaint to proceed and granted his motion for *pro bono* counsel on April 3, 2019.  (ECF No. 6.)  Plaintiff filed an Amended Complaint through counsel on August 20, 2020.  (ECF No. 6.)

Defendants subsequently moved to dismiss the Amended Complaint, and the Court granted in part and denied in part the motion to dismiss.  The following claims survived Defendants' motion to dismiss: the Eighth Amendment deliberate indifference claims against SCO Goodwin and SCO Napierala in their personal capacities (Counts One and Two), the NJCRA claim for deliberate indifference to Plaintiff's serious medical needs against SCO Goodwin and SCO Napierala in their personal capacities (Count Five), state law claims for Intentional Infliction of Emotional Distress against SCO Goodwin and SCO Napierala (Count Six), state law negligence claims against all Defendants (Count Seven), and punitive damages claims against SCO Goodwin and SCO Napierala.  (*See* ECF Nos. 44-45.)

On January 12, 2024, Defendants moved for summary judgment on all remaining claims. (ECF No. 83.)  Plaintiff filed his opposition papers on February 6, 2024.  (ECF No. 85.)

Defendants filed their reply, and Plaintiff filed a sur-reply with the Court's permission.  (ECF Nos. 89 & 101.)  The docket reflects that expert discovery has not yet concluded.

## II.   LEGAL STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014); *see also* Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quotations omitted); Fed. R. Civ. P. 56(a).

It is well established that the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex,* 477 U.S. at 323 (internal citation omitted).  The moving party may also meet its burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof."  *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (quotations and citations omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material if it "might affect

the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate.  *See id.* at 250-51.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.   DISCUSSION

### a.   Eighth Amendment Deliberate Indifference Claims

The Court begins with the Eighth Amendment claims, which Plaintiff brings pursuant to section 1983 and the NJCRA.  In Count One of the Amended Complaint, Plaintiff alleges that SCO Goodwin and SCO Napierala were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, and in Count Five of the Amended Complaint, Plaintiff alleges the same claim under the NJCRA.[4]  In Count Two, Plaintiff alleges that SCO Goodwin and

---

[4]     The NJCRA protects federal rights and substantive rights under New Jersey's Constitution. *See Gormley v. Wood-El*, 218 N.J. 72, 97 (2014) ("Section 1983 applies only to deprivations of federal rights, whereas N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws.").  The NJCRA is typically treated as the state court analog to section 1983.  The parties have not argued that the standards for Plaintiff's deliberate indifference claim are different under section 1983 or the NJCRA, so the Court considers them together.

SCO Napierala subjected him to inhumane conditions of confinement in violation of the Eighth

Amendment.  The Court addresses both theories of liability below.

### 1. Deliberate Indifference to Plaintiff's Medical Needs under the Eighth Amendment and the NJCRA (Count One and Count Five)

In relevant part, the Eighth Amendment forbids the "inflict[ion]" of "cruel and unusual

punishments."  U.S. Const. amend VIII.  The Eighth Amendment requires prison officials to

"ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v.

Brennan*, 511 U.S. 825, 832 (1994).  Prison officials must also "take reasonable measures to

guarantee the safety of . . . inmates."  *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) (citing

*Farmer*, 511 U.S. at 832).  The Supreme Court first held in *Estelle v. Gamble* that the Cruel and

Unusual Punishments Clause prohibits government officials from exhibiting "deliberate

indifference to [the] serious medical needs of prisoners." 429 U.S. 97, 104-05 (1976).  The *Estelle*

Court recognized the obligation to provide medical care for those whom [the state] is punishing

by incarceration," because "the prisoner . . . cannot by reason of the deprivation of his liberty . . .

care for himself."  429 U.S. at 103 (citation omitted).  The Court recognized that the denial of

medical care to prisoners "denies them their dignity and does not comport with standards of

decency."  *Id.*  "In the worst cases," denial of medical care may "produce physical torture or a

lingering death" and "[i]n less serious cases, denial of medical care may result in pain and suffering

which no one suggests would serve any penological purpose.  The infliction of such unnecessary

suffering is inconsistent with contemporary standards of decency."  *Id.*

In *Farmer v. Brennan*, the Court clarified that "a prison official violates the Eighth

Amendment only when two requirements are met."   511 U.S. at 834.  *First*, "the deprivation

alleged must be, objectively, 'sufficiently serious.'"  *Id.* (citation omitted).  *Second*, "[t]o violate

the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable

state of mind"—i.e., "deliberate indifference." *Id.* (citations omitted). Thus, in order to sustain an Eighth Amendment claim under 42 U.S.C. § 1983, a plaintiff must make (1) an objective showing that "those needs were serious" and (2) a subjective showing that "the defendants were deliberately indifferent to [his or her] medical needs." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002). In addition, even a "prison official[ ] who actually knew of a substantial risk to inmate health or safety may be found free of liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. That is, a "prison official[ ] who act[s] reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845.

Defendants do not dispute for purposes of this motion that Plaintiff's heart attack on December 2, 2018, is an objectively serious medical need.[5] Therefore, *Farmer's* first requirement is satisfied. At issue is whether Plaintiff has provided sufficient evidence to satisfy *Farmer*'s second requirement that SCO Goodwin and SCO Napierala acted with deliberate indifference.

To act with deliberate indifference to a serious medical need is to recklessly disregard "a substantial risk of serious harm." *Id.* at 839. It is well established that deliberate indifference may be shown by "intentionally denying or delaying medical care." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) (quoting *Estelle*, 429 U.S. at 104). "The question under the Eighth Amendment

---

[5] "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The "seriousness" prong requires a plaintiff to demonstrate that the need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987); *see also Pearson v. Prison Health Servs.*, 850 F.3d 526, 534 (3d Cir. 2017) (noting that a medical need is serious where it has been diagnosed by a physician as requiring treatment). At the other end of the spectrum, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Lanzaro*, 834 F.2d at 347.

is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Id.* (quoting *Farmer*, 511 U.S. at 843).

There is "a critical distinction" between claims based on inadequate medical care and claims based on intentional denial or delay of medical care. *See Pearson v. Prison Health Servs.*, 850 F.3d 526, 535 (3d Cir. 2017) (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)); *see* also *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (explaining that the court has "found deliberate indifference in situations where necessary medical treatment is delayed for non-medical reasons" (cleaned up)).  In cases where a prisoner challenges the adequacy of medical care, "mere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation." *Pearson*, 850 F.3d at 535. (internal quotation and citation omitted).  In such cases, courts presume that the medical care provided to the plaintiff was adequate, and the plaintiff must show that the medical provider did not exercise professional judgment. *See id.* at 536; *see also White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990) (mere medical malpractice or disagreement with the proper treatment of an illness cannot give rise to a violation of the Eighth Amendment).  In contrast, "a delay or denial of medical treatment claim must be approached differently than an adequacy of care claim," and "there is no presumption that the defendant acted properly." *Pearson*, 850 F.3d at 537.  To survive summary judgment in such a case, "[a]ll that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

This case involves a delay in necessary medical care.  Specifically, viewed in the light most favorable to Plaintiff, the evidence shows that Plaintiff complained to SCO Goodwin that he was

having chest pain and was having a heart attack, but SCO Goodwin and SCO Napierala refused to issue a medical pass until Plaintiff completed the urine test.

Defendants argue that there is insufficient evidence that SCO Goodwin or SCO Napierala actually realized that Plaintiff was experiencing a medical crisis.  As explained by the Supreme Court, however, a plaintiff does not need to provide direct evidence that a defendant had the requisite state of mind:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Cf. [1 W.] LaFave & [A.] Scott, [Substantive Criminal Law] § 3.7, p. 335 [(1996)] ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of").

*Farmer*, 511 U.S. at 842-43 (some internal citations omitted).  "Deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony."  *Pearson*, 850 F.3d at 535.

For instance, in *Sealock v. Colorado*, the plaintiff reported to a corrections officer that he had chest pain and was having trouble breathing; the corrections officer observed that the plaintiff was sweating, vomiting, and appeared pale.  218 F.3d 1205, 1208-10 (10th Cir. 2000).  The corrections officer initially told the plaintiff there was nothing she could do because there was no one at clinical services until 6 a.m., and told the plaintiff to let her know if the pain got worse.  *Id.* The plaintiff's cellmate summoned the corrections officer again about an hour later, and the corrections officer called her supervisor, Barrett.  *Id.*  The plaintiff's cellmate told Barrett that the plaintiff was having a heart attack, and the plaintiff

14

told Barrett he was having chest pain and might be having a heart attack. Barrett told appellant there was nothing he could do for him. Barrett stated there was no one at Clinical Services, it would take an hour to get the van warmed up, and it was snowing outside. Barrett offered appellant an antacid, which he declined. Appellant testified that Barrett told him: "Just don't die on my shift. It's too much paper work." (citation omitted.)

*Id.* at 1208.  The Tenth Circuit drew the following inferences based on these facts:

Although Barrett disclaims any recollection of the events, the following reasonable inferences concerning his conduct may be drawn from the testimony of other witnesses for purposes of summary judgment consideration. Barrett observed appellant at a time when he was very pale, sweating and had been vomiting. Both appellant and Zack Bernal, appellant's roommate, told Barrett that appellant was or might be having a heart attack. [FN omitted.] Barrett refused to transport appellant immediately to a doctor or a hospital because it was snowing outside and it would take time to warm up the prison van for transportation. Finally, Barrett told appellant not to die on his shift.

*Id.* at 1210.  The Tenth Circuit found that Plaintiff had provided sufficient evidence to meet the subjective element of deliberate indifference because "Barrett was informed that appellant might be having a heart attack," "was present when appellant displayed symptoms consistent with a heart attack," and "allegedly refused to drive appellant to the hospital, and told appellant not to die on his shift."  *Id.* at 1210–11.

Here, Plaintiff was sixty-six years old and overweight at the time of the incident.  Plaintiff testified that he told SCO Goodwin directly that Plaintiff had chest pain and believed he was having a heart attack.  Plaintiff also testified that SCO Napierala heard this conversation.  Both Defendants allegedly knew that Plaintiff was having trouble urinating due to his enlarged prostate, and Defendants nevertheless told Plaintiff he would not get a medical pass until he completed the urine test, which took Plaintiff the full two hours to complete.  Plaintiff further testified that he was sweating and had trouble breathing, but he tried to compose himself despite the pain.  Plaintiff also

testified that he defecated before he could reach the restroom due to the intense pain. SCO Goodwin and SCO Napierala did not call a Code 53 to have Plaintiff transported to the medical clinic during or after the urine test, arguably in violation of the NJSP IMP, which requires corrections officers to treat severe chest pain, chest pain accompanied by breathing issues, and/or chest pain accompanied by loss of consciousness as a medical emergency.[6] After Plaintiff provided the urine sample, SCO Goodwin wrote "CHEST PAIN" on the medical pass and allegedly made sarcastic comments about Plaintiff's ability to "make it down to medical." Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could find that SCO Goodwin and SCO Napierala drew the inference that Plaintiff was having a medical crisis but delayed Plaintiff emergency medical care for nonmedical reasons.

Defendants emphasize that Plaintiff was standing, sitting, and walking around during the two-hour period he was having a heart attack, as captured on the video. Defendants imply that Plaintiff appeared normal despite his claims that he was experiencing chest pain and having a heart attack. Plaintiff's version of the events, however, is not blatantly contradicted by the video evidence. *See Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 192 (3d Cir. 2021) ("In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage." (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)); *see also Parnell v. Jackson Twp.*, Civ. No. 21-19326, 2024 WL 2767896, at *5 (D.N.J. May 30, 2024).

Consistent with Plaintiff's deposition testimony, the video shows Plaintiff bending over, rubbing his upper stomach, and sitting uncomfortably. The video evidence also shows Plaintiff

---

[6]     The Court need not decide whether the Defendants were obligated to call a Code 53 under the circumstances or simply provide him with a medical pass, but Plaintiff is free to pursue this theory of liability if the case proceeds to trial.

standing and walking around, and he does not lose consciousness or fall to the ground at any point. Plaintiff testified that in addition to his intense chest pain, he was sweating and had difficulty breathing, and the grainy video neither confirms nor refutes his account of these symptoms. Plaintiff also testified that he defecated due to the intense pain prior to reaching the restroom, which was located off camera. Because the video evidence does not blatantly contradict Plaintiff's version of events, the Court adopts Plaintiff's account for purposes of summary judgment and the qualified immunity analysis.

Defendants also contend that the evidence does not rule out the possibility that SCO Goodwin and SCO Napierala hypothetically believed that Plaintiff had heartburn, indigestion, gas, or another less serious ailment. Defendants argue that Plaintiff's complaints about chest pain and his statements to SCO Goodwin that he was having a heart attack, along with his other symptoms, are insufficient to show that SCO Goodwin and SCO Napierala acted with deliberate indifference to his serious medical needs, and that Plaintiff must provide additional evidence that Defendants actually drew the inference that he was experiencing a medical emergency. The Court disagrees. As explained in *Mata v. Saiz*, "evidence presented to the district court support[ed] the conclusion that [Defendant] was in fact aware [Plaintiff] was suffering from severe chest pains and required medical attention" because Plaintiff "personally reported as much to [Defendant]." 427 F.3d 745, 756 (10th Cir. 2005) (finding that defendant who provided no care to plaintiff with severe chest pain "refused to perform her gatekeeping role in a potential cardiac emergency by not seeking a medical evaluation for [plaintiff]" as required by the prison policies and procedures). The symptoms of a heart attack are common knowledge, even to laypersons. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir 2005) ("even laypersons can be expected to know that a person showing the warning signs of a heart attack needs treatment immediately in order to avoid

death"); *see also Thomas v. City of Harrisburg*, 88 F.4th 275, 281-82 (3d Cir. 2023) ("The facts . . . alleged support the position that a layperson in the Officers' situation would have been aware both of the danger of cocaine ingestion and of the fact that [prisoner] had ingested cocaine."); *Vaughn v. Gray*, 557 F.3d 904, 909 (8th Cir. 2009) ("A reasonable jury could conclude that Appellants' knowledge of [inmate's] symptoms and his request for medical assistance, coupled with Appellants' failure to take any responsive action, is sufficient to establish deliberate indifference.").

The Court agrees with Plaintiff that he has done "[a]ll that is needed," showing that "a reasonable jury" could find "the delay or denial was motivated by non-medical factors"—i.e., the demand that Plaintiff finish the urine sample prior to receiving medical care.[7]  *Pearson*, 850 F.3d at 537.  (Conte Dep. 13:6–18 (Ex. A) ("[Defendants stated,] until we get a urine sample, you're not going anywhere.").)  Indeed, the officers' refusal to provide Plaintiff with prompt medical attention until he completed the urine test, their failure to call a Code 53 or assist Plaintiff in getting to the medical department, and SCO Goodwin's comments could indicate that they did not believe that Plaintiff was having a medical crisis.  A jury considering this evidence could also find that Defendants knew Plaintiff was having a medical crisis but recklessly disregarded that serious risk of harm.  *See Pearson*, 850 F.3d at 535 (noting that, when "intent becomes critical," it is "important

---

[7]      In their reply, Defendants argue that Plaintiff was free to simply leave the urine test and report to the medical clinic without obtaining a medical pass.  The Court agrees with Plaintiff that Defendants' argument mischaracterizes Plaintiff's deposition testimony.  Moreover, Defendants have offered no evidence that Plaintiff could have defied senior corrections officers' orders to complete the drug test and walked away from his unit to the medical clinic without a medical pass. (*See* Goodwin Sec. Dep. 75:2-4 (explaining that the medical pass permits the inmate to travel from the unit to the medical clinic); Napierala Sec. Dep. 24:18-24 (explaining that inmates with emergency passes are sent to traffic control, which directs all movements through the facility).)

that the trier of fact hear" the defendant's "testimony in order to assess his credibility" (citing *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993))).

Defendants rely on several circuit court decisions that are easily distinguishable from the present circumstances.  Defendants cite to the Third Circuit decision *Sharpe v. Medina* for the proposition that an hours-long delay in treating chest pains does not amount to deliberate indifference.  450 F. App'x 109, 114 (3d Cir. 2011).  The plaintiff in *Sharpe* alleged, among other claims, that a health services administrator and a nurse were deliberately indifferent to his medical needs because they refused to provide immediate medical treatment when he was suffering from severe chest pains.  Prior to the incident in question, however, the plaintiff had been treated for severe chest pain and was diagnosed with "atypical chest pain" after an EKG.  *See id.* at 110.  A medical doctor who examined him determined that the plaintiff's chest pain was not indicative of a heart attack.  *See Sharpe v. Medina*, Civ. No. 10-04276, 2011 WL 3444230, at *1 (Aug. 8, 2011) ("After he performed an echocardiogram, [the doctor] concluded that Plaintiff did not suffer a heart attack, but has atypical chest pain not caused by a blood flow obstruction.").  The plaintiff was also prescribed a beta blocker for high blood pressure and chest pain.  *Sharpe*, 450 F. App'x at 110.  The plaintiff then experienced severe chest pain again in the early morning hours of June 3, 2009, but he did not receive treatment for this latest episode of chest pain until later that afternoon.  *Id.* at 111.  That morning, the nurse told the plaintiff that he would not be treated until she finished the medication line, and the health administrator determined that his condition was not urgent.  *Id.*  The plaintiff's medical attention was further delayed until the afternoon by an institutional lockdown.  *Id.*  Plaintiff eventually received another EKG, which confirmed the same diagnosis.  *Id.*  The District Court noted that "[o]ver the next several months, Plaintiff continuously returned to the health services unit complaining of chest pain.  The records from these visits

indicate the seriousness or severity of his condition never increased." *Sharpe*, 2011 WL 3444230, at *2.

In granting summary judgment, the district court determined that the health administrator and nurse had exercised their medical judgment on June 3, 2009, and determined that Plaintiff's need for treatment was not urgent. *Id.* at *6. The court emphasized that "the medical staff had provided emergency medical care for Plaintiff the month before when the symptoms first arose, knew that the cause had been diagnosed and knew that Plaintiff had been returned to the population with an appropriate prescription to address his condition." *Id.* The Third Circuit Court of Appeals affirmed, finding that the plaintiff "failed to point to evidence that [the Defendants'] determination that his need for medical care was not urgent established deliberate indifference to his medical needs." *Sharpe*, 450 F. App'x at 113.

Plaintiff's circumstances in this case differ dramatically from those of the plaintiff in *Sharpe*. The plaintiff in *Sharpe* received emergency care when his severe chest pains first occurred and was diagnosed with atypical chest pain, which was not caused by blood flow obstruction, i.e., a heart attack. Although the plaintiff's chest pains returned, he did not provide evidence that he required urgent medical care from the medical defendants who were familiar with his condition. In contrast, Plaintiff in this action did not receive prior emergency care for his severe chest pain and medical providers had not already determined that his chest pain had a benign cause. The theory of liability and evidence in *Sharpe*, therefore, do not dictate the result in this case.

Defendants also rely on an unpublished Sixth Circuit decision, *Cairelli v. Vakilian*, 80 F. App'x 979, 984 (6th Cir. 2003). There, a prisoner died of a heart attack after the on-call physician misdiagnosed his symptoms as indigestion, and the civil rights suit was brought by his estate. The majority acknowledged the fact that the prisoner "was suffering from a heart attack was . . . the

most obvious conclusion, both to other physicians and to lay people." *Id.* However, the plaintiff's symptoms could have indicated heart attack or indigestion, and the doctor treated the prisoner for indigestion; therefore, the majority in *Cairelli* was "hard pressed to find deliberate indifference without a showing of subjective awareness, even when the decision to treat indigestion is unreasonable." *Id.*

*Carielli* is not binding on this Court, but even so, *Carielli* is readily distinguishable because it involved the adequacy of medical care provided by a defendant doctor, and in such cases, there is a presumption that the defendant doctor exercised professional judgment. *See Pearson*, 850 F.3d at 535. Here, there is no such presumption, *see id.* at 537, and there is also no evidence before the Court that SCO Goodwin or SCO Napierala believed, reasonably or unreasonably, that Plaintiff was suffering from indigestion or some other less serious medical ailment.

Defendants also cite to another unpublished Sixth Circuit decision, *Estate of Harbin v. City of Detroit*, 147 F. App'x 566 (6th Cir. 2005). There, the plaintiff brought a civil rights action against the City of Detroit on behalf of her deceased brother who had died of a heart attack after officers at the City of Detroit jail failed to provide him with medical attention for his chest pains. A witness testified that the plaintiff had called out to his jailers that he was having chest pain and that the jailers had twice glanced in the plaintiff's direction. Notably, a group of detainees were creating a commotion, and it was unclear whether the jailers were paying attention to the plaintiff's plight. *Id.* at 570-71. A witness also testified that the plaintiff had "broken out in a 'light sweat' and was intermittently clutching his chest." *Id.* at 571. The majority determined that there was no evidence that the jailers were aware that the plaintiff faced a substantial risk of serious harm. *Id.* The majority emphasized that because "this episode occurred at night in the confines of a chaotic holding cell in a Detroit Police Department Precinct, [the court] cannot conclude that a layperson

observing [the plaintiff's] condition would have easily recognize[d] the necessity for a doctor's attention." *Id.* The majority also found that because the witness did not see or hear the plaintiff's conversation with the sergeant, there was no evidence that the sergeant knew that the plaintiff was experiencing a medical emergency. *Id.* at 571. Because the plaintiff could not demonstrate that the officers or sergeant were deliberately indifferent to the deceased's medical needs, the plaintiff could not demonstrate that any constitutional violation occurred. *Id.* at 572.

*Estate of Harbin* is also not binding on this Court, and the circumstances are once again readily distinguishable from the circumstance in this case.[8] Here, Plaintiff did not experience severe chest pain in a chaotic booking environment and whether SCO Goodwin or SCO Napierala were paying attention to his plight is at best disputed. Moreover, Plaintiff survived his heart attack and testified that he told SCO Goodwin directly several times that he was experiencing severe chest pain and was having a heart attack and that SCO Napierala heard this exchange.

Defendants also rely on the Seventh Circuit decision, *Henderson v. Sheahan*, which involved a pretrial detainee who sued sheriff and corrections officials at a county jail, claiming due process violations based on injuries allegedly sustained as result of his exposure to second-

---

[8]      The Sixth Circuit's decision in *Harbin* also includes a dissent from Judge Cole, who would have found that "a genuine issue of material fact exists as to whether the prison guards actually noticed that Harbin was suffering from obvious symptoms of heart failure." *Estate of Harbin*, (Cole, Circuit Judge, dissenting) 147 F. App'x at 574. As explained by the dissent, "knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* (citing *Farmer*, 511 U.S. at 842). Moreover, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citing *Farmer*, 511 U.S. at 842. Therefore, the dissent found that "a trier of fact could conclude that prison officials knew that there was a substantial risk of heart failure." *Id.* at 582; *see also Estate of Harbin*, 147 F. App'x. at 575 (Russell, Circuit Judge, concurring (concurring in the judgment that the City was not liable but "agree[ing] with the dissent that taking the facts in the light most favorable to the Plaintiff results in the conclusion that Plaintiff has presented sufficient proof to raise a material issue of fact as to whether there has been a constitutional violation").

hand smoke.   196 F.3d 839, 842 (7th Cir. 1999).  There, the plaintiff claimed that the "continuous exposure to excessive levels of second-hand smoke caused him to experience difficulty in breathing, chest pains, dizziness, drowsiness, sinus problems, burning sensations in his throat and headaches" and alleged that "he may experience significant health problems in the future as a result of being forced to breathe cancer-causing second-hand smoke throughout his four-and-one-half year detention."  *Id.*  The Seventh Circuit held that the plaintiff's breathing problems, chest pains, and other ailments caused by second-hand smoke were not a serious medical need, *see id.* at 846, and the Court did not address whether the defendants acted with deliberate indifference, which is the central issue in this case. Moreover, the Seventh Circuit did not suggest that chest pains, difficulty breathing, and similar symptoms could never be a serious medical need, but merely found that the symptoms were not sufficient in that case to maintain a constitutional claim for exposure to second-hand smoke.

Indeed, in *Mathison v. Moats*, the Seventh Circuit found that the prisoner-plaintiff's deliberate indifference claims based on an inexplicable delay in treating his heart attack symptoms survived summary judgment.  812 F.3d 594, 596 (7th Cir. 2016).  In *Mathison*, the plaintiff had a heart attack at 3 a.m. in his cell and alerted a guard immediately.  The guard summoned his lieutenant, who called a nurse.  The nurse told the lieutenant that Mathison's condition was not an emergency and instructed Mathison to go to the infirmary the following day, and the lieutenant deferred to the nurse.  *Id.* at 596.  As here, the plaintiff in *Mathison* had suffered a heart attack, and also suffered in pain for several hours before he was treated.  *Id.*  Once the plaintiff arrived in the prison infirmary, he was immediately taken to the hospital where he was diagnosed with a heart attack and received a stent.  *Id.*  The Seventh Circuit found that the nurse and lieutenant both

displayed deliberate indifference and reversed the district court's grant of summary judgment.  *Id.* at 598-99.

In sum, the decisions cited by Defendants are readily distinguishable, and there is substantial persuasive authority holding that prison officials could be held liable based on deliberate indifference for the delay in providing medical care for a prisoner who has chest pains and says he is having a heart attack.  As explained in *Farmer*,

> it remains open to prison officials to prove that they were unaware even of an obvious risk to inmate health or safety.  That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

511 U.S. at 844.  For purposes of summary judgment, however, Plaintiff has provided sufficient evidence to create a triable issue of fact regarding whether SCO Goodwin and SCO Napierala knew Plaintiff was having a medical crisis and acted with deliberate indifference to that risk.  For all these reasons, the Court denies summary judgment to Defendants on the Eighth Amendment and NJCRA claims alleging deliberate indifference to Plaintiff's need for medical care.

**2.  Eighth Amendment Conditions of Confinement Claim (Count Two)**

In Count Two of the Amended Complaint, Plaintiff separately alleges that his conditions of confinement on the morning of December 2, 2018, violate the Eighth Amendment.  As explained in the prior section, the Eighth Amendment prohibits deprivations suffered during incarceration "that constitute an 'unnecessary and wanton infliction of pain,' including 'those that are totally without penological justification.'"  *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  To determine whether the

deprivation is sufficiently serious, courts use a totality-of-the-circumstances approach.  That is, "[c]onditions . . . alone or in combination[] may deprive inmates of the minimal civilized measure of life's necessities," and "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise."  *Id.* at 373-74 (quoting *Wilson*, 501 U.S. at 304, and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  But "[n]othing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson,* 501 US at 305.  Deliberate indifference to a prisoner's serious medical needs, as alleged in Count One, is a type of conditions of confinement claim.  *See id.* at 303 (explaining that "the medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates").

In opposing summary judgment on Count Two, Plaintiff contends that SCO Goodwin and SCO Napierala subjected Plaintiff to inhumane conditions of confinement by requiring Plaintiff to complete his urine test despite his prostate issues, failing to call a Code 53, and forcing Plaintiff to walk himself to the medical department while he was having a heart attack.  In the Court's view, these circumstances coupled with Plaintiff's claim that he was having a heart attack all relate to Plaintiff's medical care.  The jury can consider these alleged circumstances in determining whether Defendants' conduct violated Plaintiff's Eighth Amendment rights and his rights under the NJCRA.  These circumstances, however, do not set forth a distinct conditions of confinement claim, separate from his claim for inadequate medical care.  For this reason, Defendants are entitled

to summary judgment on the conditions of confinement claim in Count Two to the extent it is not a distinct claim.

Indeed, to the extent Count Two is just another way of pleading deliberate indifference to Plaintiff's medical needs, courts have inherent authority to dismiss duplicative claims.  *See, e.g., Walker v. City of Newark*, Civ. No. 19-16853, 2020 WL 3542502, at *12 (D.N.J. July 1, 2020) (dismissing the portions of a count that "would duplicate [another two counts] and would be subject to the same analysis"); *Brown & Brown, Inc. v. Cola*, 745 F.Supp.2d 588, 626-27 (E.D. Pa. 2010) (dismissing a count where it was "nothing more than duplicative" of other counts in a complaint); *Caudill Seed & Warehouse Co., Inc. v. Prophet 21, Inc.*, 123 F.Supp.2d 826, 834 (E.D. Pa. 2000) (dismissing a count that "merely duplicates" another count).  As such, the Court also dismisses without prejudice the Eighth Amendment conditions of confinement claim in Count Two to the extent it is duplicative of the Eighth Amendment denial of medical care claim in Count One.

### b. Defendants Are Not Entitled to Qualified Immunity on Plaintiff's Deliberate Indifference to Medical Care Claims

Defendants also claim that SCO Goodwin and SCO Napierala are entitled to qualified immunity.  The two-prong test for qualified immunity considers whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right and whether that right was clearly established at the time of the alleged violation.  *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (To overcome a claim of qualified immunity, a plaintiff must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." (cleaned up)); *Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been violated.  If it has, we then must decide if the

right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful.").

"[T]he party asserting the affirmative defense of qualified immunity" bears the burden of persuasion on both prongs at summary judgment. *Id.* (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)). Pursuant to the Supreme Court's explanation in *Pearson v. Callahan*, those inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address. *See* 555 U.S. 223, 236 (2009).

The Court has already determined for purposes of summary judgment that there are sufficient facts for a reasonable jury to find that SCO Goodwin and SCO Napierala were deliberately indifferent to Plaintiff's need for necessary medical attention and denied him medical care for nonmedical reasons. As such, the evidence when viewed in the light most favorable to Plaintiff shows a violation of a constitutional right, and Defendants are not entitled to qualified immunity on prong one.

Qualified immunity also protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments." *Harlow*, 457 U.S. at 818. In order for the right to be clearly established, "existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Courts "typically look to Supreme Court precedent or a consensus in the Courts of Appeals to give an officer fair warning that his conduct would be unconstitutional." *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017). "If the law was

clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19.

In 1976, the Supreme Court first recognized "the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103; *see id* at 101, 108 (affirming dismissal of deliberate indifference claims against medical providers but "remand[ing] the case to the Court of Appeals to allow it an opportunity to consider . . . whether a cause of action has been stated against the other prison officials" based on their refusal to provide care for the prisoner's medical needs, which included chest pains). "[A]n inmate with a potentially serious problem repeatedly requesting medical aid, receiving none, and then suffering a serious injury" is "the prototypical case of deliberate indifference." *See Hudson v. McHugh*, 148 F.3d 859, 863-64 (7th Cir. 1998). For purposes of qualified immunity, however, "the right must be defined beyond a high level of generality," *Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)), but there need not be "a case directly on point for a right to be clearly established." *Id.* (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021)). That is, "it is not necessary to have a case involving a heart attack, a case involving appendicitis, or a case involving a bowel obstruction for a § 1983 claim based on one of those conditions to survive qualified immunity. Instead, a clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Russell v. Lumitap*, 31 F.4th 729, 737-38 (9th Cir. 2022) (quotations and citations omitted).

Construing the facts in the light most favorable to Plaintiff, the Court defines the right at issue as follows: When a corrections officer is aware that a prisoner is experiencing a medical crisis that has well-known symptoms, such as a heart attack, and the prisoner informs corrections

officers that he is having a heart attack, describes symptoms of a heart attack to the corrections officers, and is exhibiting outward signs of medical distress consistent with a heart attack, the officer must promptly obtain medical care for the prisoner and may not delay or deny medical care for nonmedical reasons, even if the prisoner can still stand and walk.  Here, the law at the time of this incident was sufficiently clear that every reasonable officer would understand that he was violating Plaintiff's rights by forcing Plaintiff to wait for over 90 minutes to obtain medical attention for a suspected heart attack.

It is well settled in the Third Circuit that a prison official is deliberately indifferent to a prisoner's serious medical need where he "delays necessary medical treatment based on a non-medical reason." *Rouse*, 182 F.3d at 197; *Monmouth Cnty. Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) ("Short of absolute denial, if necessary medical treatment is . . . delayed for non-medical purposes, a case for deliberate indifference has been made out." (internal quotation marks omitted)).  Moreover, a consensus of circuit courts holds that "[a] prison inmate has a right to receive prompt medical treatment of a heart attack."  *Mathison*, 812 F.3d at 597 (citing *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007)); *see also Sealock*, 218 F.3d at 1210 (concluding that a prison official's refusal to drive an inmate to the hospital when he had been informed that the inmate might be having a heart attack and witnessed the inmate displaying symptoms consistent with a heart attack, and told the inmate not to die on his watch met the deliberate indifference standard); *Estate of Carter*, 408 F.3d at 312-13 (deliberate indifference standard met where an official delayed transportation to a hospital for a detainee who had not taken what an officer believed was her heart medication for three days and who was displaying "classic" signs of an impending heart attack such as chest pain and difficulty breathing); *Plemmons v. Roberts*, 439 F.3d 818, 823-25 (8th Cir. 2006) (deliberate indifference standard was

satisfied by a delay in treatment for an inmate with a history of heart problems who displayed "classic heart attack symptoms" that were "obviously severe," including arm and chest pains, profuse sweating, and nausea); *see also Maulsby v. Ephrain*, Civ. No. 22-4840, 2024 WL 1253689, at *4 (E.D. Pa. Mar. 22, 2024) ("Maulsby, a wheelchair bound man in his mid-sixties, was in distress, complaining of severe chest pains.  It would be obvious to a layperson in [the defendant's] position that Maulsby needed medical attention . . . .").

Because a reasonable jury could determine that SCO Goodwin and SCO Napierala acted with deliberate indifference to Plaintiff's serious medical needs, and it is clearly established that prison officials must provide prompt medical attention to a prisoner who is having a heart attack or similar medical crisis, SCO Goodwin and SCO Napierala are not entitled to qualified immunity.

### c.   The State Law Claims

#### 1.   Defendants Are Not Entitled to Summary Judgment on the IIED claims (Count Three) Prior to the Completion of Expert Reports

Defendants also argue that they are entitled to summary judgment on Plaintiff's claims for intentional infliction of emotional distress ("IIED").  IIED requires a showing that (1) defendant acted intentionally; (2) defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"; (3) defendant's actions proximately caused him emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it."  *Segal v. Lynch*, 413 N.J. Super. 171, 191 (App. Div. 2010) (citation omitted).

Defendants do not focus on whether depriving a prisoner of medical care while he is having a heart attack constitutes extreme or outrageous conduct.  Instead, Defendants resolve disputed facts in their favor and contend that Plaintiff has provided no evidence that SCO Goodwin or SCO

Napierala knew Plaintiff was having a medical emergency or intended to cause Plaintiff emotional distress.  The Court, however, has determined that a reasonable jury could find that Defendants acted with deliberate indifference, which is a standard akin to criminal recklessness, *see Farmer*, 511 U.S. at 836-38, and that a jury must determine whether SCO Goodwin or SCO Napierala had the requisite state of mind.  Moreover, "for an intentional act to result in liability, the defendant must either "intend both to do the act and to produce emotional distress" or "act[] recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366 (1988).  Whether the individual Defendants had the requisite state of mind is best left to the jury to decide.

With respect to causation and the severity of Plaintiff's emotional distress, Defendants contend that Plaintiff has not produced an expert report demonstrating that their conduct caused him emotional distress, does not have a psychiatric diagnosis, and has not provided evidence that he is seeing a psychiatrist or counselor for his symptoms.  To show that he experienced severe emotional distress, Plaintiff cites to the allegations of his Amended Complaint and portions of his deposition testimony where he describes the physical pain that caused him to lose his bowels and the sarcastic comments made by SCO Goodwin.  Plaintiff did not explicitly testify about emotional distress in his deposition.  The allegations in the Amended Complaint and cited deposition testimony are insufficient to show that this incident caused him severe emotional distress, but it is unclear whether Plaintiff intends to provide an expert report on this issue.  *See e.g., Hawkins v. Borough of Barrington*, 2018 WL 3945768, at *3 (N.J. Super. App. Div. Aug. 17, 2018) (affirming dismissal of IIED claim where Plaintiffs "proffered no medical testimony to connect [the plaintiff's] health issues to the [incident]" and "[n]either plaintiff testified in their depositions to distress 'so severe that no reasonable [person] could be expected to endure it'" (quoting *Buckley*,

111 N.J. at 366)).  Because expert reports are not yet due, it is inappropriate to grant summary judgment on the IIED claims against SCO Goodwin and SCO Napierala at this juncture.  The Court denies without prejudice the motion for summary judgment with respect to the IIED claim, subject to renewal prior to trial, if appropriate.

### 2. Defendants Are Not Entitled to Summary Judgment on the Negligence Claims (Count Four)

Defendants also argue that they are entitled to summary judgment on Plaintiff's negligence claims.  To prevail on his claim of negligence against Defendants NJDOC and NJSP, Plaintiff must prove (1) defendants owed a duty of care; (2) defendants breached that duty; (3) actual and proximate causation; and (4) damages.  *Fernandes v. DAR Dev. Corp.*, 119 A.3d 878, 885-86 (N.J. 2015).  Plaintiff clarifies in his opposition brief that that NJDOC and NJSP are vicariously liable only with respect to Plaintiff's negligence claim.  Defendants do not challenge that NJDOC and NJSP can be held vicariously liable if Officers Goodwin and Napierala are found to be negligent.  A public entity can be held liable for its employees' actions taken within the scope of their employment, and the Officers were directed to oversee Plaintiff's urine sample in their place of employment.  N.J. Stat. Ann.  § 59:2-2(a); *see Di Cosala v. Kay*, 450 A.2d 508, 513 (N.J. 1982).

The Court agrees with Plaintiff that he has provided sufficient evidence to survive summary judgment against Defendants for negligence.[9]  Moreover, Defendants do not argue that they have no duty of care toward Plaintiff.  Instead, they argue that Plaintiff cannot establish that they breached their duty of care because he has not shown that they "subjectively knew that Plaintiff was having a serious medical issue."  As the Court has already found, this is a disputed issue of

---

[9]      Plaintiff argues that the IMP establishes that the Defendants had a duty to call a Code 53. The Court need not resolve this issue.  Defendants admittedly did not call a Code 53 and allegedly refused to write Plaintiff a medical pass until he finished his urine test.  This Court has already determined that a reasonable jury could find that the latter conduct amounts to deliberate indifference, which is a more culpable state of mind than negligence.

fact, which the Court may not resolve at summary judgment.  In their moving brief, Defendants make no other arguments in favor or dismissal of the negligence claim, and the Court denies summary judgment on this claim.

### 3.  Defendants Are Not entitled to "Good Faith" Immunity

Finally, Defendants contend that SCO Goodwin and SCO Napierala are entitled to "good faith" immunity under N.J. Stat. Ann. § 59:3-3, which provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law."  A public employee can satisfy the good faith requirement either by demonstrating "objective reasonableness," or that the public employee behaved with "subjective good faith."  *Alston v. City of Camden*, 168 N.J. 170, 186 (2001).  The NJTCA, however, does not provide immunity if the conduct at issue "constituted a crime, actual fraud, actual malice or willful misconduct."  *See Est. of Vargas v. Cnty. of Hudson*, Civ. No. 14-01048, 2020 WL 3481774, at *10 (D.N.J. June 26, 2020) (citing N.J. Stat. Ann. § 59:3-14).  "Willful misconduct 'is not immutably defined but takes its meaning from the context and purpose of its use,'" *id.* (citing *Fielder v. Stonack*, 141 N.J. 101, 124 (1995)), and "falls somewhere 'between simple negligence and the intentional infliction of harm.'"  *Id.* (quoting *Foldi v. Jeffries*, 93 N.J. 533, 549 (1983)).  While willful misconduct "need not involve the actual intent to cause harm, there must be some knowledge that the act is wrongful."  *Id.*  A defendant is not entitled to immunity under N.J. Stat. Ann. § 59:3-3, if there is a "showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences."  *Est. of Vargas*, 2020 WL 3481774, at *10 (quoting *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 N.J. 396, 414 (1962)).

Here, a reasonable jury could find that Defendants SCO Goodwin and SCO Napierala had "knowledge of a high degree of probability of harm" when they required Plaintiff to wait over 90

minutes to obtain medical care for his heart attack symptoms.  As such, they are not entitled to good faith immunity, and the Court denies summary judgment on this issue.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 83) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, summary judgment is granted as to the Eighth Amendment conditions of confinement claims in Count Two to the extent it is duplicative of the claim for deliberate indifference to Plaintiff's medical needs in Count One.  The motion is denied in all other respects.  An appropriate Order follows.

Dated: August 29, 2024.

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE